**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ARC LINK LLC, | ) | Case No. 2:26-cv-00 |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| CHECK POINT SOFTWARE | ) | |
| TECHNOLOGIES LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Arc Link LLC ("Arc Link" or "Plaintiff") for its Complaint against Defendant

Check Point Software Technologies Ltd. ("Check Point" or "Defendant") for patent infringement

alleges as follows:

**THE PARTIES**

1. Arc Link is a limited liability company organized and existing under the laws of

the State of Texas, with its principal place of business located at 209 East Austin Street, Marshall,

TX 75670.

2. On information and belief, Defendant Check Point Software Technologies Ltd. Is

a corporation organized under the laws of the Country of Israel, with its principal place of business

at 5 Shlomo Kaplan Street, Tel Aviv 6789159, Israel, and may be served pursuant to the provisions

of the Hague Convention. On information and belief, Check Point does business in Texas and in

the Eastern District of Texas, directly or through intermediaries.

**JURISDICTION**

3. This is an action for patent infringement arising under the patent laws of the United

States, 35 U.S.C. §§ 1, et seq.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has personal jurisdiction over Defendant. Defendant regularly conducts business and has committed acts of patent infringement and/or has induced acts of patent infringement by others in this Judicial District and/or has contributed to patent infringement by others in this Judicial District, the State of Texas, and elsewhere in the United States.

5.      In addition, or in the alternative, this Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(2).

6.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 because, among other things, Defendant is not a resident in the United States and thus may be sued in any judicial district pursuant to 28 U.S.C. § 1391(c)(3).

7.      Defendant is subject to this Court's jurisdiction pursuant to due process and/or the Texas Long Arm Statute due at least to its substantial business in this State and Judicial District, including (a) at least part of its past infringing activities, (b) regularly doing or soliciting business in Texas, and/or (c) engaging in persistent conduct and/or deriving substantial revenue from goods and services provided to customers in Texas.

## PATENT-IN-SUIT

8.      On January 17, 2017, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,549,328 (the "'328 Patent") entitled "Method to Optimize the Communication Parameters Between an Access Point and at Least One Client Device." A true and correct copy of the '328 Patent is available at: https://patentimages.storage.googleapis.com/50/de/24/af4679ee108f51/US9549328.pdf.

9.      On January 24, 2023, the United States Patent and Trademark Office duly and

2

legally issued U.S. Patent No. 11,563,655 (the "'655 Patent") entitled "Network Monitoring Apparatus and Method Thereof in Programmable Network Virtualization." A true and correct copy of the '655 Patent is available at: https://patentimages.storage.googleapis.com/a5/08/d8/2e29aa4e0103e4/US11563655.pdf.

10. On June 12, 2012, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,200,592 (the "'592 Patent") entitled "System and Method for Modeling Multilabel Classification and Ranking." A true and correct copy of the '592 Patent is available at: https://patentimages.storage.googleapis.com/88/eb/23/796fe1fa21644c/US8200592.pdf.

11. On January 24, 2017, the United States Patent and Trademark office duly and legally issued U.S. Patent No. 9,552,548 (the "'548 Patent") entitled "Using Classified Text and Deep Learning Algorithms to Identify Risk and Provide Early Warning." A true and correct copy of the '548 Patent is available at: https://patentimages.storage.googleapis.com/57/26/b8/e9ba3a9b1bff90/US9552548.pdf.

12. Arc Link is the sole and exclusive owner of all right, title, and interest in the '328 Patent, the '655 Patent, the '592 Patent, and the '548 Patent, (collectively, the "Patents-in-Suit" or "Asserted Patents") and holds the exclusive right to take all actions necessary to enforce its rights to the Patents-in-Suit, including the filing of this patent infringement lawsuit. Arc Link also has the right to recover all damages for past, present, and future infringement of the Patents-in-Suit and to seek injunctive relief as appropriate under the law.

13. Arc Link has at all times complied with the marking provisions of 35 U.S.C. § 287 with respect to the Patents-in-Suit. On information and belief, prior assignees and licensees have also complied with the marking provisions of 35 U.S.C. § 287.

## FACTUAL ALLEGATIONS

3

14.    The '328 Patent generally relates to a system and method to optimize the communication on a channel between an access point and at least one client device. The technology described in the '328 Patent was developed by inventors Julien Herzen, Ruben Merz, and Patrick Thiran. By way of example, this technology may be implemented in hardware and/or software products that manage wireless communications, monitor wireless-channel conditions, and adjust communication parameters between access points and client devices.

15.    The '655 Patent generally relates to a system and method implemented with a network hypervisor, or equivalent thereof, to implement software defined network (SDN)-based network virtualization. The technology described in the '655 Patent was developed by inventors Gyeongsik Yang, Minkoo Kang, and Hyuck Yoo. By way of example, this technology may be implemented in hardware and/or software products that virtualize shared physical network resources into separately managed virtual networks and provide statistics or monitoring information associated with those virtual networks.

16.    The '592 Patent generally relates to a system and method for determining and utilizing detection models, such as models for machine condition monitoring. The technology described in the '592 Patent was developed by inventors Klaus Brinker and Claus Neubauer. By way of example, this technology may be implemented in hardware and/or software products that monitor condition information from multiple devices, sensors, or telemetry sources; evaluate or classify detected conditions; distinguish relevant conditions from non-relevant conditions; and output an evaluated condition, alert, or report.

17.    The '548 Patent generally relates to methods for using deep learning to identify specific, potential risks. The technology described in the '548 Patent was developed by inventor Nelson E. Brestoff. By way of example, this technology may be implemented in hardware and/or

software products that use trained artificial-intelligence, machine-learning, deep-learning, or natural-language-processing models to analyze enterprise communications or other enterprise text, identify risks or threats, and output alerts, reports, scores, incidents, or case-management events.

18. Check Point has infringed and continues to infringe the Patents-in-Suit by making, using, selling, offering to sell, and/or importing, and by actively inducing others to make, use, sell, offer to sell, and/or importing, products that infringe the Patents-in-Suit.

**COUNT I**
**(Infringement of the '328 Patent)**

19. Paragraphs 1 through 18 are incorporated by reference as if fully set forth herein.

20. Arc Link has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '328 Patent.

21. Defendant has and continues to directly infringe the '328 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States Patent products that satisfy each and every limitation of one or more claims of the '328 Patent. Such products include, but are not limited to, hardware and/or software products that provide wireless access-point functionality, manage wireless channels, monitor wireless-channel conditions, configure or automatically select wireless-channel frequency and/or bandwidth, and manage wireless-client connectivity, such as Check Point Spark Firewall and Quantum Spark Wi-Fi appliances, including Spark Firewall 1500 Pro Wi-Fi models, Spark Firewall 1900 and 2000 appliances with Wi-Fi functionality where applicable, Spark Firewall 2500 Wi-Fi and Wi-Fi 7 models, and related Check Point wireless-management software, firmware, cloud-management software, and security-gateway software, among other Check Point products.

22. For example, Defendant has and continues to directly infringe at least claim 1 of

the '328 Patent by making, using, offering to sell, selling, and/or importing into the United States, hardware and/or software products that optimize communications between an access point and client devices by managing wireless channels, channel width, radio settings, and client connectivity, such as the Check Point Spark Firewall 2530 Wi-Fi 7 appliance, in operation with Check Point wireless-management software and related Check Point hardware and/or software accused herein. The Check Point Spark Firewall 2530 Wi-Fi 7 appliance is exemplary of how the other Check Point products accused herein infringe the '328 Patent.

23.    For example, the Check Point Spark Firewall 2530 Wi-Fi 7 appliance performs a method to optimize communications on a channel between an access point and a plurality of client devices, said channel being characterized by a center frequency and a bandwidth, said method comprising: establishing by the access point (e.g., the integrated wireless access point and Wi-Fi 7 radio of the Check Point Spark Firewall 2530 appliance) a connection with the client devices (e.g., Wi-Fi stations, such as laptops, phones, tablets, IoT devices, and other wireless endpoints associated with the Spark Firewall 2530 wireless network) on a first channel (e.g., the selected wireless channel used by the Spark Firewall 2530 wireless radio for an SSID or wireless network) having a first center frequency and a first bandwidth (e.g., the channel frequency and channel width selected or configured for the Spark Firewall 2530 wireless radio).

| Appliance | Model | Appliance Homepage |
|---|---|---|
| 2530 / 2550 | T90 Wired, WiFi7 and WiFi7 + Cellular | sk183193 |

[1] https://sc1.checkpoint.com/documents/Appliances/Quantum_Spark_R82.00.X/AdminGuides_Locally_Managed/EN/CP_R82.00.X_Appliances_Locally_Managed_AdminGuide.pdf.

## Using Default WiFi

Starting in version R82.00.00, you can use the default SSID for a WiFi connection.

 **Note -**

- This option is only available when connecting the appliance for the first time and the First Time Configuration Wizard did not yet run.
- Only available for one hour.

1. Connect the appliance cable and the WAN cable.

2. Use the SSID and password printed on the appliance sticker to connect to WiFi.

---

2

https://sc1.checkpoint.com/documents/Appliances/Quantum_Spark_R82.00.X/AdminGuides_Locally_Managed/EN/Content/Topics/Setting-up-Quantum-Spark-Appliance.htm.

Syntax

```
set wlan radio [ band {2.4GHz | 5GHz} ]
        channel-width <channel-width>
        channel <channel-number>
        country <country>
        operation-mode <mode>
        scheduler-inactive-period {off | on}
        scheduler-mode {off | on}
        off
        on
```

Parameters

| Parameter | Description |
|---|---|
| band | Specifies the WLAN band.<br>Applies to wireless models that contain a concurrent dual band option using two radio antennas.<br>Press the TAB key to see the available options. |
| channel-width | Configures the WLAN channel width:<br>• 20 - 20 MHz<br>• 40 - 40 MHz<br>• 80 - 80 MHz<br>• 80+80 - 80+80 MHz<br>• 160 - 160 MHz<br>• auto - Automatic |
| channel | Configures the WLAN channel number:<br>• 1 - 165<br>• auto - Automatic |
| country | Configures the WLAN country. |
| operation-mode | Configures the WLAN 802.11 operation mode:<br>• 11ac - 802.11ac (5GHz)<br>• 11b - 802.11b<br>• 11n - 802.11n<br>• 11bg - 802.11bg<br>• 11ng - 802.11ng<br>• 11nac - 802.11n/ac (5GHz)<br>• 11g - 802.11g<br>• 11bgnax - 802.11bgnax (2.4GHz)<br>  ⓘ Note - This value is supported starting from the R81.10.05 version.<br>• 11anacax - 802.11anacax (5GHz)<br>  ⓘ Note - This value is supported starting from the R81.10.05 version. |
| scheduler-inactive-period | Controls the WLAN radio transmitter during the configured time periods:<br>• on - Do not disable the WLAN radio transmitter (make it active)<br>• off - Disable the WLAN radio transmitter (make it inactive) |
| scheduler-mode | Enables (on) or disables (off) the WLAN scheduler. |
| off | Disables the WLAN radio transmitter (for all WLAN bands, or for the specified WLAN band). |
| on | Enables the WLAN radio transmitter (for all WLAN bands, or for the specified WLAN band). |

3

---

3

https://sc1.checkpoint.com/documents/Appliances/Quantum_Spark_R82.00.X/CLI/EN/Content/Topics/set-wlan-radio.htm.

8

24.     The Check Point Spark Firewall 2530 Wi-Fi 7 appliance performs the step of exchanging by the access point data through the first channel with the client devices (e.g., wireless data-frame communications exchanged between the Spark Firewall 2530 wireless radio and associated Wi-Fi client devices over the selected wireless channel).

25.     The Check Point Spark Firewall 2530 Wi-Fi 7 appliance performs the step of monitoring by the access point a first interference level on the first channel (e.g., wireless-radio monitoring, automatic channel selection, DFS-related channel evaluation, channel availability assessment, congestion assessment, and other wireless-channel-condition evaluation performed or used by the Spark Firewall 2530 wireless radio).

26.     The Check Point Spark Firewall 2530 Wi-Fi 7 appliance performs the step of reviewing compatibility levels to the access point from the client devices (e.g., client-device wireless capabilities, association information, supported radio bands, supported channel behavior, signal information, and whether a client device can operate on another wireless band or channel), a compatibility level for a client device defining whether the client device is able to dynamically switch from the first channel to another second channel having a different center frequency (e.g., whether the client device can operate on a target wireless band or channel selected by the Spark Firewall 2530 wireless radio) and if the client device will change channels in response to an instruction from the access point (e.g., whether the client device will respond to access-point or wireless-control behavior that causes the client to connect, reconnect, or operate on a different wireless channel or band).

27.     The Check Point Spark Firewall 2530 Wi-Fi 7 appliance performs the step of instructing the client devices to switch to a second channel having a different center frequency and/or a different bandwidth (e.g., automatic Wi-Fi channel change, wireless-radio channel

9

reselection, DFS-driven channel movement, or client steering that causes compatible client devices to operate on a different selected wireless channel, band, or channel width) only if all compatibility levels for all client devices indicate that all client devices are able to dynamically switch from the first channel to the second channel.

| Enable automatic WiFi Channel Change | Specifies whether WiFi switches channels automatically during operation.<br>Type: Boolean<br>Default: false |
|---|---|

[4]

28.     The Check Point Spark Firewall 2530 Wi-Fi 7 appliance performs the step of determining by the access point a second interference level on the second channel (e.g., assessing or monitoring wireless-channel conditions associated with the alternative selected channel).

29.     The Check Point Spark Firewall 2530 Wi-Fi 7 appliance performs the step of comparing by the access point the first interference level with the second interference level (e.g., automatic channel-selection logic comparing wireless-channel conditions to identify a preferred or less-congested channel).

30.     The Check Point Spark Firewall 2530 Wi-Fi 7 appliance performs the step of deciding by the access point whether to switch back to the first channel based on the comparison (e.g., wireless-radio channel-management logic that evaluates whether to remain on the current channel, switch to another channel, or return to a prior channel based on monitored wireless-channel conditions).

31.     Through demonstrations, testing, repairs, troubleshooting, training, and instructional guidance, Check Point has used the Accused Products in a manner that directly infringes at least the method claims of the '328 Patent.

---

[4] https://sc1.checkpoint.com/documents/SMB_R80.20.60/AdminGuides/Locally_Managed/EN/Topics/Configuring-Advanced-Settings.htm.

32.     Defendant has and continues to indirectly infringe one or more claims of the '328 Patent by knowingly and intentionally inducing others, including Check Point customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

33.     Defendant, with knowledge that these products, or the use thereof, infringe the '328 Patent at least as of the date of this Complaint, has knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '328 Patent by providing these products to others for use in an infringing manner.  Alternatively, on information and belief, Defendant has adopted a policy of not reviewing the patents of others, including specifically those related to Defendant's specific industry, thereby remaining willfully blind to the Patents-in-Suit at least as early as the issuance of the Patents-in-Suit.

34.     Defendant has induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, infringe the '328 Patent, but while remaining willfully blind to the infringement. Defendant has and continues to induce infringement by its customers, partners, and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendant's website, product literature and packaging, and other publications, including the documents cited herein.

35.     Defendant has indirectly infringed and continue to indirectly infringe one or more claims of the '328 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States.

Defendant's affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '328 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '328 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be specially made or adapted for use in the infringement of the '328 Patent. Defendant performs these affirmative acts with knowledge of the '328 Patent and with intent, or willful blindness, that they cause the direct infringement of the '328 Patent.

36.    Arc Link has suffered damages as a result of Defendant's direct and indirect infringement of the '328 Patent in an amount to be proven at trial.

37.    Arc Link has suffered, and will continue to suffer, irreparable harm as a result of Defendant's infringement of the '328 Patent, for which there is no adequate remedy at law, unless Defendant's infringement is enjoined by this Court.

## COUNT II
### (Infringement of the '655 Patent)

38.    Paragraphs 1 through 18 are incorporated by reference as if fully set forth herein.

39.    Arc Link has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '655 Patent.

40.    Defendant has and continues to directly infringe the '655 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '655 Patent. Such products include, but are not limited to, hardware and/or software products that implement, support, manage, or monitor

virtualized security gateways, virtual firewalls, virtual systems, virtual networks, or virtualized network resources and provide statistics, monitoring information, flow information, port information, interface information, or resource information associated with such virtualized network environments, such as Check Point Quantum R82 and R82.10 security-gateway software, Check Point VSX and VSNext functionality in Quantum R82 and R82.10, Check Point Quantum Force and Quantum Firewall appliances introduced or offered after January 24, 2023, including Check Point 9000, 9700, 9800, 19000, 19100, and 29000 series appliances where configured with the accused virtualization functionality, Check Point CloudGuard Network Security virtual gateways, Check Point Security Management Server, SmartConsole, Multi-Domain Security Management, Skyline, and related Check Point monitoring, management, telemetry, and API software, among other Check Point products.

41.    For example, Defendant has and continues to directly infringe at least claim 1 of the '655 Patent by making, using, offering to sell, selling, and/or importing into the United States hardware and/or software products that virtualize shared physical network resources into separately managed virtual networks and provide statistics, monitoring, or management information associated with those virtual networks, such as the Check Point Force 9100 Security Gateway running Quantum R82 with VSNext or VSX functionality, in operation with Check Point security-management software and related Check Point hardware and/or software accused herein. The Check Point Force 9100 Security Gateway running Quantum R82 with VSNext or VSX functionality is exemplary of how the other Check Point products accused herein infringe the '655 Patent.

42.    For example, the Check Point Force 9100 Security Gateway comprises a computing apparatus implemented with a network hypervisor implementing software-defined-network-based

network virtualization (e.g., Quantum R82 VSNext or VSX functionality that allows the Force 9100 Security Gateway to run multiple Virtual Systems, Virtual Gateways, virtual firewalls, or virtual security gateways on shared physical gateway hardware), the computing apparatus comprising: a statistics virtualization module (e.g., VSNext or VSX status, monitoring, logging, telemetry, SmartConsole, SmartView, Skyline, API-accessible data, and virtual-system statistics associated with the Force 9100 Security Gateway) configured to receive a request for individual physical resource consumption statistics for a first virtual network (e.g., a first Virtual System, tenant, domain, virtual firewall, Virtual Gateway, or virtual security gateway running on the Force 9100 Security Gateway) of multiple separately managed virtual networks; determine whether at least one physical resource is shared between the first virtual network and at least one other of the multiple separately managed virtual networks (e.g., shared Force 9100 hardware, shared CPU, shared memory, shared physical interfaces, shared acceleration resources, shared routing resources, shared connection-handling resources, or other shared gateway-platform resources used by multiple Virtual Systems or Virtual Gateways); and isolatedly provide individual physical resource consumption statistics to the first virtual network based on the determination whether the at least one physical resource is shared (e.g., Check Point Security Management Server, Check Point Multi-Domain Server, per-Virtual-System or per-Virtual-Gateway status, monitoring, logs, counters, interface information, traffic information, connection information, or resource-related telemetry associated with a particular virtual security).

14

## Introduction

The VSX Administration Guide describes the **Virtual System eXtension** product that runs several virtual firewalls on the same hardware.

Each **Virtual System** works as a Security Gateway, typically protecting a specified network. When packets arrive at the VSX Gateway, it sends traffic to the Virtual System protecting the destination network. The Virtual System inspects all traffic and allows or rejects it according to rules defined in the security policy.

In order to better understand how virtual networks work, it is important to compare physical network environments with their virtual (VSX) counterparts. While physical networks consist of many hardware components, VSX virtual networks reside on a single configurable VSX Gateway or cluster that defines and protects multiple independent networks, together with their virtual components.



### vsx stat

**Description**

Shows status information for VSX Gateway.

**Syntax**

```
vsx stat [-l] [-v] [<VSID>]
```

ⓘ **Important** - On Scalable Platforms (Maestro and Chassis), you must run the applicable commands in the Expert mode on the applicable Security Group.

**Parameters**

| Parameter | Description |
|---|---|
| -l | Shows a list of all Virtual Devices and their applicable information. |
| -v | Shows a summary table with all Virtual Devices. |
| <VSID> | Specifies a Virtual Device by its ID. |

---

5

https://sc1.checkpoint.com/documents/R82/WebAdminGuides/EN/CP_R82_VSX_AdminGuide/Content/Topics-VSXG/Introd.

6

https://sc1.checkpoint.com/documents/R81/WebAdminGuides/EN/CP_R81_CLI_ReferenceGuide/Topics-CLIG/VSXG/vsx-stat.htm.



43.     For example, the Check Point Force 9100 Security Gateway comprises a statistics virtualization module, wherein the statistics virtualization module provides respective virtual flow entry statistics to the first virtual network (e.g., connection information, session information, security-policy logs, traffic records, rule-hit information, or flow-related telemetry associated with a first Virtual System or Virtual Gateway), including provision of virtual flow entry statistics for the first virtual network and provision of virtual port statistics (e.g., Check Point Security Management Server, Check Point Multi-Domain Server, VSNext and VSX interface statistics, VLAN-interface statistics, virtual-interface statistics, trunk-interface statistics, and per-Virtual-System interface statistics) based on the at least one physical resource for the first virtual network.

---

7

https://sc1.checkpoint.com/documents/R81/WebAdminGuides/EN/CP_R81_VSX_AdminGuide/Topics-VSXG/VSX-Management-Overview.htm.

```
Example 2 - Show a list of all Virtual Devices and their applicable information.

[Expert@MyVsxGW:2]# vsx stat -l

VSID:           0
VRID:           0
Type:           VSX Gateway
Name:           VSX1_192.168.3.241
Security Policy: VSX_Cluster_VSX
Installed at:   20Sep2019 22:06:33
SIC Status:     Trust
Connections number: 5
Connections peak:   43
Connections limit:  14900

VSID:           1
VRID:           1
Type:           Virtual System
Name:           VS1
Security Policy: VS_Policy
Installed at:   20Sep2019 22:07:03
SIC Status:     Trust
Connections number: 0
Connections peak:   3
Connections limit:  14900

VSID:           2
VRID:           2
Type:           Virtual System
Name:           VS2
Security Policy: VS_Policy
Installed at:   20Sep2019 22:07:01
SIC Status:     Trust
Connections number: 0
Connections peak:   2
Connections limit:  14900
[Expert@MyVsxGW:2]#
```
[8]

44.     Through demonstrations, testing, repairs, troubleshooting, training, and instructional guidance, Check Point has used the Accused Products in a manner that directly infringes at least the method claims of the '655 Patent.

45.     Defendant has and continues to indirectly infringe one or more claims of the '655 Patent by knowingly and intentionally inducing others, including Check Point customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing

---

[8]

https://sc1.checkpoint.com/documents/R81/WebAdminGuides/EN/CP_R81_CLI_ReferenceGuide/Topics-CLIG/VSXG/vsx-stat.htm.

technology.

46.    Defendant, with knowledge that these products, or the use thereof, infringe the '655 Patent at least as of the date of this Complaint, has knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '655 Patent by providing these products to others for use in an infringing manner.  Alternatively, on information and belief, Defendant has adopted a policy of not reviewing the patents of others, including specifically those related to Defendant's specific industry, thereby remaining willfully blind to the Patents-in-Suit at least as early as the issuance of the Patents-in-Suit.

47.    Defendant has induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, infringe the '655 Patent, but while remaining willfully blind to the infringement. Defendant has and continues to induce infringement by its customers, partners, and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendant's website, product literature and packaging, and other publications, including the documents cited herein.

48.    Defendant has indirectly infringed and continue to indirectly infringe one or more claims of the '655 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '655 Patent is directly infringed by others. The accused components within the Accused

Products are material to the invention of the '655 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be specially made or adapted for use in the infringement of the '655 Patent. Defendant performs these affirmative acts with knowledge of the '655 Patent and with intent, or willful blindness, that they cause the direct infringement of the '655 Patent.

49.    Arc Link has suffered damages as a result of Defendant's direct and indirect infringement of the '655 Patent in an amount to be proven at trial.

50.    Arc Link has suffered, and will continue to suffer, irreparable harm as a result of Defendant's infringement of the '655 Patent, for which there is no adequate remedy at law, unless Defendant's infringement is enjoined by this Court.

## COUNT III
### (Infringement of the '592 Patent)

51.    Paragraphs 1 through 18 are incorporated by reference as if fully set forth herein.

52.    Arc Link has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '592 Patent.

53.    Defendant has and continues to directly infringe the '592 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '592 Patent. Such products include, but are not limited to, hardware and/or software products that monitor condition information from multiple networked devices, gateways, virtual systems, interfaces, services, sensors, or telemetry sources; evaluate, classify, prioritize, or rank detected conditions; distinguish actionable or relevant fault, anomaly, alert, degraded-health, or incident conditions from normal or non-relevant conditions; and output evaluated machine conditions, alerts, dashboards, incidents, or reports, such as Check

19

Point ThreatCloud AI, Check Point Skyline, Check Point OpenTelemetry Agent functionality, CPView-based telemetry, Check Point Quantum Security Gateway and Quantum Force appliances used as monitored telemetry sources, Check Point VSX and VSNext environments used as monitored virtualized security systems, Check Point Maestro environments where monitored, Check Point CloudGuard Network Security gateways where monitored, Check Point Infinity XDR/XPR, Check Point AI Assist, and related Check Point monitoring, analytics, telemetry, dashboard, incident-response, and reporting software, among other Check Point products.

54.    For example, Defendant has and continues to directly infringe at least claim 20 of the '592 Patent by making, using, offering to sell, selling, and/or importing into the United States hardware and/or software products that monitor condition information from network devices, classify, score, prioritize, or rank detected conditions, separate relevant or actionable conditions from non-relevant or normal conditions, and output evaluated conditions, alerts, dashboards, or incidents, such as Check Point Threatcloud AI and/or Check Point Skyline, in operation with Check Point gateways, management servers, virtual systems, and related Check Point hardware and/or software accused herein. Check Point Skyline is exemplary of how the other Check Point products accused herein infringe the '592 Patent.

55.    For example, Check Point ThreatCloud AI performs a method of machine condition monitoring comprising: monitoring a plurality of sensors adapted to detect machine condition information (e.g., Data from Check Point Infinity XDR/XPR, Check Point Infinity Copilot, Check Point Email Security, formerly Harmony Email & Collaboration, Check Point Smart Event).





[9] Check Point ThreatCloud AI Solutions Brief at 2.  Available at:
https://www.checkpoint.com/downloads/products/threatcloud-solution-brief.pdf.
[10] Check Point ThreatCloud AI Solutions Brief at 3.  Available at:
https://www.checkpoint.com/downloads/products/threatcloud-solution-brief.pdf.



## Check Point Protects Your Everything with Accurate Prevention

Over 50+ Engines Packed with AI-based Features and Capabilities

  

| **Unknown Malware Detection** | **Zero-Day Phishing** | **Classify** | **Improve Accuracy** |
|---|---|---|---|
| Infected hosts detection, sandbox static analysis for executables, documents, and macros | Network and mobile zero-phishing detection, anti-phishing AI engine, email static analysis, and HTML body NLP | Documents meta classifier vectorization family classifier, XDR/XPR incidents aggregation, ML Similarity Model, MRAT classifier, IP Port | Network AI and mobile AI engines aggregator, machine validated signature |

[11]

56.     Check Point ThreatCloud AI performs the step of evaluating the machine condition information by employing a calibrated label ranking model predicting a zero-point label between a first subset of labels and a second subset of labels, wherein the zero-point label represents a split point between the first subset of labels and the second subset of labels (e.g., thresholding, baselining, prioritization, classification, health-scoring, or incident-evaluation logic that separates relevant or actionable degraded-health, fault, anomaly, alert, or incident conditions from normal, non-actionable, or lower-priority conditions).

57.     Check Point Skyline ThreatCloud AI performs the step of outputting an evaluated machine condition from the calibrated label ranking model based on the machine condition information (e.g., dashboards, health metrics, warnings, alerts, status outputs, incident indicators, and other evaluated outputs identifying device, gateway, interface, service, virtual-system, or

---

[11] https://www.checkpoint.com/ai/threatcloud/.

network-health conditions).

58.    Through demonstrations, testing, repairs, troubleshooting, training, and instructional guidance, Check Point has used the Accused Products in a manner that directly infringes at least the method claims of the '592 Patent.

59.    Defendant has and continues to indirectly infringe one or more claims of the '592 Patent by knowingly and intentionally inducing others, including Check Point customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

60.    Defendant, with knowledge that these products, or the use thereof, infringe the '592 Patent at least as of the date of this Complaint, has knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '592 Patent by providing these products to others for use in an infringing manner. Alternatively, on information and belief, Defendant has adopted a policy of not reviewing the patents of others, including specifically those related to Defendant's specific industry, thereby remaining willfully blind to the Patents-in-Suit at least as early as the issuance of the Patents-in-Suit.

61.    Defendant has induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, infringe the '592 Patent, but while remaining willfully blind to the infringement. Defendant has and continues to induce infringement by its customers, partners, and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendant's website, product literature and packaging, and other

publications, including the documents cited herein.

62.    Defendant has indirectly infringed and continue to indirectly infringe one or more claims of the '592 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '592 Patent is directly infringed by others.  The accused components within the Accused Products are material to the invention of the '592 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be specially made or adapted for use in the infringement of the '592 Patent. Defendant performs these affirmative acts with knowledge of the '592 Patent and with intent, or willful blindness, that they cause the direct infringement of the '592 Patent.

63.    Arc Link has suffered damages as a result of Defendant's direct and indirect infringement of the '592 Patent in an amount to be proven at trial.

64.    Arc Link has suffered, and will continue to suffer, irreparable harm as a result of Defendant's infringement of the '592 Patent, for which there is no adequate remedy at law, unless Defendant's infringement is enjoined by this Court.

## <u>COUNT IV</u>
### (Infringement of the '548 Patent)

65.    Paragraphs 1 through 18 are incorporated by reference as if fully set forth herein.

66.    Arc Link has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '548 Patent.

67.    Defendant has and continues to directly infringe the '548 Patent, either literally or

under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '548 Patent. Such products include, but are not limited to, hardware and/or software products that use trained artificial-intelligence, machine-learning, deep-learning, natural-language-processing, large-language-model, or text-classification models to analyze enterprise electronic communications, email, attachments, collaboration content, enterprise messages, and other enterprise text; identify risks or threats; and output alerts, scores, incidents, reports, investigations, or case-management events, such as Check Point Email Security, formerly Harmony Email & Collaboration, including the Avanan-based email and collaboration security offering acquired and offered by Check Point, including Check Point ThreatCloud AI, Check Point Infinity XDR/XPR, Check Point AI Assist, Check Point Playblocks, Check Point Harmony DLP functionality where used with email or collaboration-content analysis, and related Check Point email-security, collaboration-security, AI-analysis, incident-management, and workflow products, among other Check Point products.

68.     For example, Defendant has and continues to directly infringe at least claim 17 of the '548 Patent by making, using, offering to sell, selling, and/or importing into the United States hardware and/or software products that use trained artificial-intelligence, machine-learning, deep-learning, natural-language-processing, and/or text-classification models to analyze enterprise electronic communications, identify risks or threats, and report those risks or threats to an incident, investigation, or case-management workflow, such as Check Point Email Security, in operation with Check Point ThreatCloud AI and related Check Point hardware and/or software accused herein. Check Point Email Security is exemplary of how the other Check Point products accused herein infringe the '548 Patent.

69.     For example, Check Point Email Security performs a method of using classified text and deep learning algorithms to identify risk and provide early warning comprising: creating one or more training datasets for textual data (e.g., ThreatCloud AI threat-intelligence corpora, email-threat datasets, phishing datasets, malware datasets, spam datasets, malicious-link datasets, business-email-compromise datasets, collaboration-security datasets, and telemetry used to train or update Check Point threat-detection models) corresponding to one or more risk classifications (e.g., phishing, suspected phishing, business email compromise, impersonation, spam, malware, malicious URLs, suspicious attachments, account compromise, data-loss events, and other email or collaboration threats), wherein said risk classification comprises one or more threats or risks of interest.

70.     Check Point Email Security performs the step of training one or more deep learning algorithms using said one or more training datasets (e.g., ThreatCloud AI, machine-learning, natural-language-processing, email static-analysis, link-analysis, attachment-analysis, sender-analysis, domain-analysis, OCR, HTML-body NLP, classifier, document-classifier, and other AI-assisted engines trained or updated using classified threat data).



<sup>12</sup>

71.    Check Point Email Security performs the step of extracting and indexing one or more internal electronic communications of an enterprise (e.g., intercepting, analyzing, logging, indexing, or storing message content, message metadata, sender information, recipient information, attachment information, link information, domain information, collaboration-content information, and other information derived from enterprise emails or collaboration messages).

### Email Protection

When an email is sent, Email Security intercepts and sends the email to Check Point's ThreatCloud for analysis before the email is delivered to the recipient. If the verdict is malicious, then the email is handled according to the configured workflow (for example, quarantine). Otherwise, the email is delivered to the recipient.

Email Security also inspects internal and outgoing traffic, both for data leakage and for phishing and malware. Emails can be removed and modified post-delivery if needed.

[13]

72.    Check Point Email Security performs the step of applying said one or more deep learning algorithms to said one or more internal electronic communications to identify any one of said one or more threats or risks of interest (e.g., applying AI-assisted email and collaboration-security engines to email bodies, headers, links, attachments, sender reputation, domains, QR-code content, images, and collaboration messages to identify phishing, business email compromise,

---

<sup>12</sup> https://www.checkpoint.com/ai/threatcloud/.
<sup>13</sup> https://sc1.checkpoint.com/documents/Harmony_Email_and_Collaboration/Topics-Harmony-Email-Collaboration-Admin-Guide/Introduction.htm.

malware, spam, suspicious links, malicious attachments, account compromise, data-loss events, or other risks).

73.    Check Point Email Security performs the step of reporting said identified one of said one or more threats or risks of interest to an existing case-management system for action by the enterprise (e.g., reporting the detected risk as a security event, incident, investigation item, alert, ticket, workflow item, or case-management event through Email Security, Infinity XDR/XPR, AI Assist, Playblocks, a SIEM/SOAR workflow, or an integrated enterprise case-management system).

74.    Through demonstrations, testing, repairs, troubleshooting, training, and instructional guidance, Check Point has used the Accused Products in a manner that directly infringes at least the method claims of the '548 Patent.

75.    Defendant has and continues to indirectly infringe one or more claims of the '548 Patent by knowingly and intentionally inducing others, including Check Point customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

76.    Defendant, with knowledge that these products, or the use thereof, infringe the '548 Patent at least as of the date of this Complaint, has knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '548 Patent by providing these products to others for use in an infringing manner.  Alternatively, on information and belief, Defendant has adopted a policy of not reviewing the patents of others, including specifically those related to Defendant's specific industry, thereby remaining willfully blind to the Patents-in-Suit at least as early as the issuance of the Patents-in-Suit.

77.     Defendant has induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, infringe the '548 Patent, but while remaining willfully blind to the infringement. Defendant has and continues to induce infringement by its customers, partners, and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendant's website, product literature and packaging, and other publications, including the documents cited herein.

78.     Defendant has indirectly infringed and continue to indirectly infringe one or more claims of the '548 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '548 Patent is directly infringed by others.  The accused components within the Accused Products are material to the invention of the '548 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by Defendant to be specially made or adapted for use in the infringement of the '548 Patent. Defendant performs these affirmative acts with knowledge of the '548 Patent and with intent, or willful blindness, that they cause the direct infringement of the '548 Patent.

79.     Arc Link has suffered damages as a result of Defendant's direct and indirect infringement of the '548 Patent in an amount to be proven at trial.

80.     Arc Link has suffered, and will continue to suffer, irreparable harm as a result of

Defendant's infringement of the '548 Patent, for which there is no adequate remedy at law, unless Defendant's infringement is enjoined by this Court.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury for all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Arc Link prays for relief against Defendant as follows:

a.      Entry of judgment declaring that Defendant has directly and/or indirectly infringed one or more claims of the Patents-in-Suit;

b.      An order pursuant to 35 U.S.C. § 283 permanently enjoining Defendant, its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further acts of infringement of one or more of the Patents-in-Suit;

c.      An order awarding damages sufficient to compensate Arc Link for Defendant's infringement of the Patents-in-Suit, but in no event less than a reasonable royalty, together with interest and costs;

d.      Entry of judgment declaring that this case is exceptional and awarding Arc Link its costs and reasonable attorney fees under 35 U.S.C. § 285; and

e.      Such other and further relief as the Court deems just and proper.

Dated: June 17, 2026

Respectfully submitted,

 */s/ John Andrew Rubino*
John Andrew Rubino
NY Bar No. 5020797
Email: jarubino@rubinoip.com
Michael Mondelli III
NY Bar No. 5805114
Email: mmondelli@rubinoip.com
**RUBINO IP**
1200 Harbor Blvd., 10th Floor
Weehawken Township, NJ 07086

Telephone: (201) 341-9445
Facsimile: (973) 535-0921

***ATTORNEYS FOR PLAINTIFF,
ARC LINK LLC***